OPINION
¶ 1 Defendant-appellant, John Paul Glover, appeals his conviction in Clermont County Common Pleas Court for felonious assault and child endangering. We affirm appellant's conviction.
¶ 2 Appellant is the father of twin boys, Gabriel Glover ("Gabriel") and Max Glover ("Max"). On the evening of December 11, 2000, when the twins were approximately one month old, appellant's wife, Jessica Glover ("Mrs. Glover"), observed Gabriel screaming in pain and noticed that he was unable to move his right leg. After consulting with a physician on the telephone, Mrs. Glover took Gabriel to an urgent care facility for treatment. She left Max in the care of her mother while her father accompanied her to the urgent care facility. Appellant was at work at the time.
¶ 3 X-rays taken at the urgent care facility revealed that Gabriel had a fractured femur. Following the advice of the physician at the urgent care facility, Mrs. Glover and her father took Gabriel to Children's Hospital in Cincinnati for further evaluation. Mrs. Glover eventually called appellant, who met Mrs. Glover and her father at Children's Hospital. While at the hospital, appellant informed Mrs. Glover that he had accidentally dropped Gabriel while trying to pick up Max earlier that day. Appellant and Mrs. Glover then informed emergency room doctors of this fact. Additional x-rays taken at Children's Hospital revealed that Gabriel also had three rib fractures.
¶ 4 Due to concerns that Gabriel's injuries were non-accidental, emergency room doctors requested that Mrs. Glover and appellant bring Max to the hospital as well. Appellant and Mrs. Glover eventually returned with Max. X-rays performed on Max revealed that he had a fractured collarbone and three fractured ribs.
¶ 5 Due to the lack of an adequate explanation for the boys' injuries, hospital personnel referred the matter to Clermont County Job and Family Services ("CCJFS"). Appellant and Mrs. Glover soon spoke to a CCJFS caseworker. The caseworker strongly suggested that appellant make an appointment with the Clermont County Sheriff's Office to discuss the children's injuries. The next day, the Clermont County Juvenile Court granted CCJFS temporary custody of Gabriel and Max.
¶ 6 On December 13, 2000, two days after Gabriel and Max were first taken to the hospital, appellant drove to the Clermont County Sheriff's Office with Mrs. Glover and her parents. At the sheriff's office, appellant spoke to Investigator Saylor and Investigator Robinson. Appellant eventually gave a detailed, recorded statement to Investigator Saylor. In the statement, appellant indicated that he likely caused his children's injuries by picking them up too roughly on several occasions. According to appellant, in moments of frustration, he had grabbed the infants by their chests and yanked them out of their bassinet.
¶ 7 On January 10, 2001, appellant was indicted on four counts of felonious assault in violation of R.C. 2903.11(A)(1) and four counts of child endangering in violation of R.C. 2919.22(B)(2). The state later dismissed two of the child endangering counts.
¶ 8 A trial was held in Clermont County Common Pleas Court in November 2001. At trial, a number of physicians testified for the state as to the children's injuries and their likely causes. Investigators Saylor and Robinson also testified as to the statements appellant made at the Clermont County Sheriff's Office. Appellant took the stand in his own defense, testifying that he did not intentionally harm his children. Appellant's counsel also argued at trial that the children likely suffered from a genetic bone condition, which contributed to their injuries.
¶ 9 At the conclusion of the trial, the jury found appellant guilty of four counts of felonious assault and two counts of child endangering. Appellant now appeals, assigning three errors.
Assignment of Error No. 1
 "DEFENDANT-APPELLANT WAS DENIED HIS DUE PROCESS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL."
 ¶ 10 Within this assignment of error, appellant makes three arguments. First, appellant argues that his trial counsel was ineffective because he failed to file a motion to suppress the recorded statement appellant made to Investigator Saylor at the Clermont County Sheriff's office. Second, appellant argues that his trial counsel was ineffective because he failed to present expert medical testimony. Third, appellant argues that his trial counsel was ineffective because he failed to "exclude a juror" with connections to the foster parents of Gabriel and Max.
¶ 11 We first address whether appellant's trial counsel was ineffective for failing to file a motion to suppress appellant's recorded statement. In order to show that he was deprived of the effective assistance of counsel in violation of the Sixth Amendment, appellant must show two things. First, appellant must show that his counsel's performance was deficient. State v. Robb, 88 Ohio St.3d 59, 73,2000-Ohio-275. Second, appellant must show that he was prejudiced by his counsel's deficient performance. Id.
¶ 12 In order to prove his trial counsel's deficient performance, appellant must show that his counsel's performance fell below an "objective standard of reasonableness." Strickland v. Washington (1984),466 U.S. 668, 687-688, 104 S.Ct. 2052. In order to prove prejudice, appellant must show a reasonable probability that, were it not for his trial counsel's errors, the result of the proceeding would have been different. State v. Bradley (1989), 42 Ohio St.3d 136, 142. A "reasonable probability" is one that is sufficient to undermine confidence in the outcome of the proceeding. Strickland at 694.
¶ 13 Counsel is not per se ineffective for failing to file a motion to suppress. State v. Madrigal, 87 Ohio St.3d 378, 389,2000-Ohio-448, quoting Kimmelman v. Morrison (1986), 477 U.S. 365, 384,106 S.Ct. 2574. "Where the record contains no evidence which would justify the filing of a motion to suppress, the [defendant] has not met his burden of proving that his attorney violated an essential duty by failing to file the motion." State v. Gibson (1980), 69 Ohio App.2d 91,95; see, also, State v. Sawyer (May 17, 1999), Butler App. No. CA98-07-140.
¶ 14 Appellant argues that his trial counsel should have filed a motion to suppress because the state failed to read him Miranda
warnings. It is well-established that before a suspect may be subjected to custodial interrogation, he must be advised of his Miranda rights. Custodial interrogation consists of "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."Miranda v. Arizona (1966), 384 U.S. 436, 444, 86 S.Ct. 1602.
¶ 15 A person is considered in custody for purposes of Miranda
when he is placed under formal arrest or his freedom of action is restrained to a degree associated with a formal arrest. Minnesota v.Murphy (1984), 465 U.S. 420, 430, 104 S.Ct. 1136. When determining whether an individual is in custody, the relevant inquiry is whether a reasonable person in the individual's position would have believed that he or she was not free to leave given the totality of the circumstances.Berkemer v. McCarty (1984), 468 U.S. 420, 442, 104 S.Ct. 3138; State v.Gumm, 73 Ohio St.3d 413, 429, 1995-Ohio-24.
¶ 16 Appellant testified that he scheduled an appointment with Investigator Saylor at the Clermont County Sheriff's office. Appellant then drove to the sheriff's office with Mrs. Glover and her parents to give the statement. In regard to his interview with Investigator Saylor, appellant stated at trial that he "could have left at any time." Investigator Saylor also testified that she informed appellant of his right to leave. She also told him that the door to the interview room was unlocked, that he was not under arrest, and that he did not have to talk to her. The audio recording of appellant's statement confirms Investigator Saylor's testimony.
¶ 17 Our review of the record indicates that a reasonable person in appellant's position would have felt free to leave. Appellant himself admitted at trial that he was free to leave at any time. There is no evidence in the record to support the argument that appellant was "in custody" for Miranda purposes. Accordingly, appellant's trial counsel was not ineffective for failing to file a motion to suppress appellant's statement on the grounds that the state did not comply with Miranda.
¶ 18 Even when Miranda warnings are not required, the due process clause requires the exclusion of an incriminating statement if, given the totality of the circumstances, the statement was not voluntarily given.Dickerson v. United States (2000), 530 U.S. 428, 434, 120 S.Ct. 2326. In accordance with this principle, appellant also argues that an effective attorney would have filed a motion to suppress the statement on the grounds that it was involuntarily made.
¶ 19 As previously stated, Investigator Saylor informed appellant that he was free to leave, that the interview room door was not locked, that he did not have to speak with her, and that he was not under arrest. Appellant also admitted at trial that he "could leave at any time." Additionally, we do not find evidence on the audio recording indicating that appellant's will was overborne so as to make his statement involuntary. Appellant appears to have been speaking openly and freely, presenting his explanation for his children's injuries. He even corrected Investigator Saylor several times when she stated something he thought was inaccurate.
¶ 20 Our review of the record does not reveal any evidence supporting appellant's argument that his statement was involuntarily given and thus that his trial counsel should have filed a motion to suppress. Therefore, we cannot say that the performance of appellant's trial counsel fell below an objective standard of reasonableness. Accordingly, appellant's trial counsel was not ineffective for failing to file a motion to suppress on the grounds that his statement was involuntarily given.
¶ 21 Appellant next argues that his trial counsel was ineffective because he failed to present expert medical testimony. At trial, appellant's counsel argued that appellant's children might suffer from "temporary brittle bone disease" ("TBBD"), or that they might also suffer from a genetic condition known as "osteogenesis imperfecta" ("OI"). Appellant's counsel argued that these conditions would explain the children's injuries. Appellant's counsel did not present the testimony of medical experts in support of this theory. However, appellant's counsel introduced into evidence a number of medical journal articles related to these conditions, and cross-examined the state's experts with the aid of these journal articles.
¶ 22 As the U.S. Supreme Court recognized in Strickland, there are countless ways for counsel to provide effective assistance in any given case. Strickland, 466 U.S. at 689. "Judicial scrutiny of counsel's performance is to be highly deferential, and reviewing courts must refrain from second-guessing the strategic decisions of trial counsel." State v.Carter, 72 Ohio St.3d 545, 558, 1995-Ohio-104. Accordingly, trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. Bradley, 42 Ohio St.3d at 142.
¶ 23 The failure to call an expert and instead rely on cross-examination does not necessarily constitute ineffective assistance of counsel. State v. Nicholas (1993), 66 Ohio St.3d 431, 436; State v.Thompson (1987), 33 Ohio St.3d 1, 10-11. For example, in an aggravated murder case where identity of the perpetrator was the primary issue, counsel was not ineffective in failing to retain an expert to testify on the alleged weaknesses inherent in eyewitness testimony, choosing to rely upon cross-examination to impeach the eyewitnesses. State v. Madrigal,87 Ohio St.3d 378, 390, 2000-Ohio-448.
¶ 24 Additionally, counsel were not ineffective in a rape case when they chose not to request the appointment of a forensic pathologist and relied instead upon cross-examination of the state's expert to rebut evidence of the crime. Thompson, 33 Ohio St.3d at 10-11. In a case involving a charge of involuntary manslaughter, counsel was not ineffective in relying on cross-examination of the coroner instead of using an expert to rebut the coroner's opinion that the victim died as a proximate result of defendant's conduct. State v. Emch (Sept. 22, 2000), Lucas App. No. L-99-1292.
¶ 25 Thus, it is generally a legitimate trial strategy for defense counsel not to present expert testimony and, instead, rely upon cross-examination of a state's expert to rebut evidence of a crime. In many criminal cases, such a decision by trial counsel is unquestionably tactical because such an expert might uncover evidence that further inculpates the defendant. See State v. Walker (Mar. 8, 2001), Seneca App. No. 13-2000-26. Further, even if the wisdom of such an approach is debatable, "debatable trial tactics" do not constitute ineffective assistance of counsel. State v. Clayton (1980), 62 Ohio St.2d 45, 49.
¶ 26 Our review of the record indicates that appellant's trial counsel thoroughly cross-examined the array of physicians presented by the state. Appellant's trial counsel questioned these physicians about the possibility of TBBD and OI as causes for the children's injuries. On cross-examination, one of the physicians, Dr. Hopkin, conceded that appellant and his wife had told him that the victims' paternal grandfather had OI. On cross-examination, another physician, Dr. Halsted, conceded that it was possible for rib fractures to occur in the womb. Appellant's trial counsel also brought out in his cross-examination of Dr. Chamberlin, that Gabriel and Max had appeared completely healthy on previous pediatrician visits.
¶ 27 Further, appellant's trial counsel introduced several medical journal articles into evidence, including articles authored by Dr. Marvin Miller and Dr. Colin Paterson related to TBBD and OI. Appellant's trial counsel questioned several physicians about these articles and their relevance to the case. One of the articles introduced by appellant's trial counsel indicated that the likelihood of having TBBD was heightened in twins.
¶ 28 After reviewing the record, we do not find that the decision of appellant's trial counsel to rely on cross-examination rather than direct testimony of expert witnesses constituted a "deficient performance." Appellant's trial counsel thoroughly cross-examined the state's expert witnesses and introduced several medical journal articles in support of his theory of the case. We cannot say that the conduct of appellant's trial counsel fell below an objective standard of reasonableness. Appellant has failed to demonstrate that the actions of his trial counsel were outside the wide range of professionally competent assistance.
¶ 29 Appellant next argues that his trial counsel was ineffective because he failed to exclude a juror whose impartiality was allegedly in question. Appellant contends that if the juror had been removed, there is a reasonable probability that the result of the trial would have been different.
¶ 30 During the trial, a juror brought to the trial judge's attention that he knew the foster parents of the victims. Apparently, the victims' foster parents attended his church. The juror had encountered one of the foster parents in the hallway of the courthouse. When questioned by the trial judge, the juror indicated that he had not discussed anything about the victims or the case with the foster parents. Without hesitation, the juror indicated that his knowledge of the foster parents would not affect his ability to be an impartial juror in the case. Both the state and appellant's trial counsel were satisfied that the juror would be impartial. Appellant himself was not present for this discussion.
¶ 31 Appellant has failed to show that his trial counsel acted below an objective standard of reasonableness by failing to move for the juror's exclusion. The juror in question had very limited contact with the victims' foster parents. Additionally, the juror represented that he had not discussed anything related to the case with the foster parents, and that he had absolutely no concern that his impartiality would be affected. Even if counsel violated an essential duty by failing to move to excuse the juror and allowing appellant to be absent from this stage of the proceeding, there has been no demonstration that appellant was prejudiced either by the lack of a motion to excuse or his own absence from the proceedings. Therefore, we cannot say that appellant's counsel was ineffective in failing to move for the juror's exclusion.
¶ 32 Based on the foregoing, appellant has failed to prove that he received ineffective assistance of counsel. Accordingly, appellant's first assignment of error is overruled.
Assignment of Error No. 2
 "DEFENDANT-APPELLANT'S CONVICTION IS AGAINST THE MANI FEST WEIGHT OF THE EVIDENCE."
 ¶ 33 In this assignment of error, appellant argues that, given all the evidence presented at trial, the jury lost its way in finding appellant guilty beyond a reasonable doubt of felonious assault and child endangering. Specifically, appellant argues that the weight of the evidence does not indicate that he knowingly caused serious physical harm to his children, or that he tortured or cruelly abused his children.
¶ 34 In order for an appellate court to reverse a trial court's judgment on the basis that a verdict is against the manifest weight of the evidence, the appellate court must unanimously disagree with the fact-finder's resolution of any conflicting testimony. State v.Thompkins, 78 Ohio St.3d 380, 389, 1997-Ohio-52. Specifically, "[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Id. at 387. In making this analysis, the reviewing court must be mindful that the original trier of fact was in the best position to judge the credibility of witnesses and the weight to be given the evidence. Statev. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
¶ 35 In order to prove appellant's guilt of felonious assault, the state had to show that appellant "knowingly caused serious physical harm" to Gabriel and Max. Appellant does not contest that the boys suffered serious physical harm, but claims that he did not "knowingly" cause the harm. One acts knowingly when "he is aware that his conduct will probably cause a certain result or will probably be of a certain nature." R.C.2901.22(B). Therefore, the state had to prove that appellant was aware that his conduct would probably cause serious physical harm to Gabriel and Max.
¶ 36 In order to prove appellant's guilt of child endangering, the state had to prove that appellant "tortured or cruelly abused" Gabriel and Max. R.C. 2919.22(B)(2). This statutory section does not set forth the mental state necessary for a conviction. Because the statute does not plainly indicate a purpose to impose strict liability, the requisite mental state for a conviction is "recklessly." R.C. 2901.21(B). "A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result[.]" R.C. 2901.22(C). Therefore, the state had to prove that appellant, with "heedless indifference to the consequences, perversely disregarded a known risk" that he was torturing or cruelly abusing Gabriel and Max.
¶ 37 We now briefly review the evidence presented at trial. The state first presented the jury with the videotaped deposition of Dr. Kathi Mackaroff, the physician who examined Gabriel at the urgent care facility. Dr. Mackaroff also reviewed the x-rays taken of Max at Children's Hospital. Dr. Mackaroff testified that based on her training and experience, the injuries to Gabriel and Max were non-accidental. Dr. Mackaroff also testified that both Gabriel and Max were given a "cultured fiberblast" test in order to determine whether they suffered from OI. She testified that the test results did not indicate the existence of OI.
¶ 38 Dr. Michael Chamberlin, a pediatrician who examined Gabriel and Max on the afternoon of December 11, 2000, testified that there were no signs of injuries to the children when he examined them. He also testified that he did not put any pressure on the children's ribs, and that there are usually no external signs of rib fractures. He testified that he did not see any signs of child abuse.
¶ 39 Tammy Armstrong, an investigator for Clermont County Children's Protective Services, next testified. After talking with physicians at the hospital and reviewing the children's medical records, she filed a motion in Clermont County Juvenile Court requesting removal of the children from appellant and Mrs. Glover. Armstrong testified that she suspected child abuse based on her review of the records and discussions with physicians.
¶ 40 Dr. Robert Hopkin, a physician at Children's Hospital specializing in clinical genetics, testified that it was a medical certainty that Gabriel and Max did not have OI, a genetic condition that results in bones being fragile and easily broken. Appellant's counsel asked Dr. Hopkin about TBBD and certain medical journal articles written by Dr. Marvin Miller. Dr. Hopkin testified that Dr. Miller's studies were inadequately researched, and that there was little support for the existence of TBBD. He stated that Dr. Miller's theories had not been accepted by the medical community. He testified that most experts in child abuse and genetics doubted the existence of TBBD.
¶ 41 Dr. Hopkin acknowledged that appellant and Mrs. Glover had stated that the children's paternal grandfather suffered from OI. Nevertheless, Dr. Hopkin still found no evidence to support the conclusion that the children suffered from OI. Dr. Hopkin testified that OI does not "skip" a generation, and that if the children did suffer from the condition, there would be evidence of OI in their parents.
¶ 42 Dr. Michael Gelfand, a radiologist at Children's Hospital, testified as to the x-rays of Gabriel and Max. Dr. Gelfand was able to rule out infection as a cause of the children's rib fractures.
¶ 43 Dr. Mark Halsted, another radiologist at Children's Hospital, stated his belief that the children's injuries were the result of non-accidental trauma. He testified that there was no good explanation for the injuries, and that the fractures were at different stages of healing, indicating that they occurred at different times. Dr. Halsted stated that he was able to rule out infection as a cause, and that there was no sign of bone disease. Dr. Halsted admitted that it was possible, though not likely, that rib fractures could occur in the womb. Dr. Halsted testified that he did not believe in the existence of TBBD.
¶ 44 Investigator Lisa Saylor of the Clermont County Sheriff's Department testified as to the statements made by appellant at the sheriff's office. According to Investigator Saylor, appellant admitted to handling the children too roughly at times. He told Investigator Saylor that he had picked up the children roughly out of their bassinet "three or four times." According to Investigator Saylor, appellant told her that he had grabbed each of them by the chest and yanked them forcefully out of the bassinet without supporting their heads. He stated that their heads swung backwards because he used so much force.
¶ 45 According to Investigator Saylor, appellant stated that when the physicians told him of the children's broken ribs he knew that his actions in yanking them out of the bassinet had caused the injuries. He also stated that immediately after he yanked the infants out of the bassinet, he knew that he may have hurt them. Appellant explained that he was tired and frustrated when he yanked the infants out of the bassinet due to lack of sleep and long work hours. The audio recording of appellant's statement, which was played to the jury, is consistent with Investigator Saylor's testimony. On the audio recording, appellant also expresses his belief that his failure to support Max's head when he roughly pulled him out of the bassinet likely caused Max's collarbone to break. Investigator Saylor also testified that appellant told her he did not intentionally harm his children, and that he had never struck his children. Appellant offered to take a lie-detector test, which was never administered.
¶ 46 Investigator Michael Robinson of the Clermont County Sheriff's Office next testified as to appellant's statements to him regarding the children's injuries. Like Investigator Saylor, he testified that appellant told him of yanking the babies out of the bassinet on several occasions.
¶ 47 The state's last witness was Dr. Joseph Scalfani, the obstetrician who delivered Gabriel and Max. Dr. Scalfani testified that there were no complications to the delivery of Gabriel and Max.
¶ 48 The defense then presented its case. Mrs. Glover was the first witness. She testified that she was the primary caregiver of Gabriel and Max. She stated that she was present in the home with the children nearly all of their young lives. However, she testified that there were times when appellant was alone with the children. She testified that appellant did handle the children too roughly at times. Sometimes appellant played "upside-down baby," when he would hold the infants upside down by the legs. When she asked appellant to stop, appellant told her: "Jessie, they're not going to break." Mrs. Glover testified that appellant never struck the children.
¶ 49 Mrs. Glover's parents, in whose home appellant, Mrs. Glover, and the children were living, both testified for the defense. Mrs. Glover's mother testified that she never saw appellant handle the children inappropriately. Mrs. Glover's father testified that he never saw any inappropriate behavior by appellant towards the children.
¶ 50 Marilyn Roth, Mrs. Glover's aunt, testified that she saw appellant pick up one of the infants with one hand, which she thought was inappropriate. However, she testified that appellant appeared to be a good father. Jennifer Hare, a friend of Mrs. Glover, testified that she never saw appellant inappropriately handle the children.
¶ 51 Appellant then took the stand. He testified that on December 11, 2000, he accidentally dropped Gabriel while trying to pick up Max. He stated that he did not tell Mrs. Glover right away because he knew she would become upset. Appellant admitted to picking the children up too roughly "three or four times, total," but stated that he never intentionally caused harm to them. Appellant testified that he did not know if he had caused the children's injuries, but that it was possible that he did. Appellant stated that immediately after he picked up his children too roughly, he knew his actions were wrong and that he should not have picked them up without supporting their heads.
¶ 52 Given all the evidence presented at trial, we do not find that the jury lost its way in finding appellant guilty of four counts of felonious assault. Substantial evidence was presented indicating that appellant was aware that his conduct would probably result in serious physical harm to Gabriel and Max. In appellant's recorded statement, he admitted that he picked up Gabriel and Max too roughly a total of "three or four times." Appellant stated that he knew his actions were wrong at the time, and that he possibly could have harmed the children. Additionally, Dr. Mackaroff and Dr. Halsted stated their belief that the children's injuries were the result of non-accidental trauma. Dr. Hopkin testified that it was a medical certainty that the children did not have OI, and that there was little support for the existence of TBBD. Considering this evidence, the other evidence presented at trial, and the jury's superior position as a judge of witness credibility, the jury's decision was not against the manifest weight of the evidence.
¶ 53 We also find that appellant's conviction for child endangering was not against the manifest weight of the evidence. Given the evidence presented, the jury did not lose its way in finding that appellant, with heedless indifference to the consequences, perversely disregarded a known risk that he was torturing or cruelly abusing his children when he picked them up too roughly. Appellant's recorded statement and his own testimony provided the jury with ample evidence upon which it could base its decision.
¶ 54 Based on the foregoing, appellant's conviction for felonious assault and child endangering was not against the manifest weight of the evidence. Accordingly, appellant's second assignment of error is overruled.
Assignment of Error No. 3
 "DEFENDANT-APPELLANT'S CONVICTION IS AGAINST THE SUFFICIENT WEIGHT OF THE EVIDENCE."
 ¶ 55 Although it is not extremely clear, it appears that appellant is arguing that the state did not present sufficient evidence to support his conviction. In his brief, appellant does not present any specific arguments with respect to this assignment of error. Appellant merely states that "Defendant-Appellant would make the same or similar arguments as indicated above with respect to his Second Assignment of Error."
¶ 56 App.R. 12(A)(2) provides as follows:
¶ 57 "The court may disregard an assignment of error presented for review if the party raising it fails to identify in the record the error on which the assignment of error is based or fails to argue the assignment of error separately in the brief, as required under App.R. 16(A)."
¶ 58 App.R. 16(A)(7) requires that the brief include:
¶ 59 "[a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies."
¶ 60 Because appellant fails to cite any legal authority, cite any portion of the record, or present any specific argument with respect to this assignment of error, we disregard appellant's third assignment of error for failure to comply with App.R. 12(A)(2) and App.R. 16(A)(7). SeeState v. Watson (1998), 126 Ohio App.3d 316, 321.
Judgment affirmed.
WALSH, P.J., and YOUNG, J., concur.