**Bogdan GREN (98–A–1881), Petitioner,**

**v.**

**Charles GREINER, Superintendent of Green Haven Correctional Facility; and: Eliot L. Spitzer, New York State Attorney General, Respondents.**

**Nos. 02–CV–5158 (JBW), 03–MISC–0066 (JBW).**

United States District Court, E.D. New York.

July 23, 2003.

Donna Aldea, District Attorney, Queens County, Kew Gardens, NY, for Defendants.

Martin M. Lucente, Legal Aid Society, Brooklyn, NY, for Plaintiff.

## MEMORANDUM, JUDGMENT & ORDER

WEINSTEIN, Senior District Judge.

The petition for a writ of habeas corpus is denied. No hearing on this matter is necessary. This memorandum briefly addresses petitioner's claims.

### I. Facts and Procedural History

Petitioner was convicted of kidnaping, felony murder and weapon possession arising from a May 1996 incident during which petitioner and a codefendant stabbed and shot to death the victim. The only question presented in the instant proceeding is whether pretrial statements made by petitioner were obtained by police in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). A *Huntley* hearing was conducted by the hearing court to determine whether the statements should be suppressed. The following summary of the *Huntley* proceeding is taken largely from the statement of facts set forth by the hearing court in its decision denying the motions of petitioner and his codefendant to suppress pretrial statements:

Police Officer Michael Gennaro, assigned to foot patrol in the area of the Queens Center Mall, observed a red Mercury smashing into the rear of another moving vehicle in the vicinity of the Queens Boulevard intersection at 59th Avenue. As the officer approached the vehicles in order to write an accident report, he heard what sounded like gunshots and then he saw a man, later identified as Sergi Zadorozhnyi, with a gun in his hand. Zadorozhnyi, with one arm in a cast, pointed the gun at a second male, later identified as petitioner Bogdan Gren, who was holding a knife in his hand. As the officer approached the two, Zadorozhnyi turned towards the officer and pointed the gun at him. Officer Gennaro drew his weapon and ordered him to drop the gun. The officer saw Gren say something to Zadorozhnyi and then both men dropped their weapons to the ground.

Officer Gennaro held the two men at gunpoint while he radioed for back-up assistance. Within minutes other officers arrived at the scene. Officer Gennaro was subsequently informed that the body of a deceased male had been discovered in the rear seat of one of the automobiles. An ambulance arrived at the scene and Gren, who appeared to be injured, was "patted down." Accompanied by Police Officer Shelton, he was placed in the ambulance and transported to Elmhurst General Hospital. Zadorozhnyi, who did not appear injured, was transported by other police personnel to the 110th Precinct.

Detective Hunt was assigned to the investigation of this incident and, after arriving at Queens Boulevard and 59th Avenue, spoke to Officer Gennaro. The detective learned that the man who was discovered in the vehicle was dead and that Gren had been taken to Elmhurst General Hospital. At approximately ten p.m. that evening, the detective went to the hospital and was informed that Gren was on a gurney in the trauma room. Detective Hunt ascertained from attending physicians that although Gren was on an interveinal apparatus, his prognosis was "not likely to die" and that

the detective would be able to speak to him soon.

Shortly thereafter, Detective Hunt approached Gren as he lay uncuffed on a gurney in the trauma room. No uniformed officers were present in the room. In English, the detective introduced himself to Gren and asked him what had happened that evening. Gren then gave a narrative concerning an incident which occurred the preceding week involving the "Russian Mafia" and which culminated in the incident that evening. Gren stated that while traveling in his vehicle, his passenger, Edward Kaykov, had stabbed him and he, in turn, fired shots at Kaykov, using an antique gun. During the interview, which lasted approximately twenty minutes, Gren was responsive to the detective's questions and had no difficulty making himself understood. As Detective Hunt left Gren, he observed that an officer from the 110th Precinct was stationed outside the trauma room.

Meanwhile, as Detective Hunt was at the hospital speaking to Gren, a Detective Martinez, who had been working in his office at the 110th Precinct, received a telephone communication from a Detective Corrano who described the incident at Queens Boulevard and 59th Avenue and said that there was one DOA and "one perp on the way to Command."

Gren, who remained as a patient at Elmhurst General Hospital, was re-visited by Detective Hunt for the purpose of conducting a second conversation with him. Although Gren had not yet been arraigned, he was in police custody at this time. With Gren's girlfriend present in the room, the detective initially administered full *Miranda* warnings to Gren. Gren informed the detective that he wished to speak to his attorney. At that point, Detective Hunt attempted no further conversations and left the hospital.

Hunt added, upon questioning by the prosecutor, that Gren had told him that he had put one handcuff on himself and one on Kaykov, the deceased.

The hearing court denied the motion to suppress petitioner's pretrial statements. It concluded, in brief, that police were not obliged to provide petitioner with *Miranda* warnings prior to questioning him at the hospital because the interview was noncustodial in nature.

After a jury trial, petitioner was found guilty of second degree murder, first degree kidnaping, second degree kidnaping, and second degree criminal possession of a weapon. He was sentenced to 25 years to life in prison.

The convictions were affirmed on direct appeal by the Appellate Division. Leave to appeal to the New York Court of Appeals was denied. Petitioner filed a pro se motion to vacate judgment before the trial court. The motion was denied and leave to appeal to the Appellate Division was denied.

In the instant application for a writ of habeas corpus, petitioner claims that his Fifth and Fourteenth Amendment rights were violated by the trial court's failure to suppress statements obtained by police in violation of *Miranda*. Petitioner is represented by counsel from the Legal Aid Society.

## II. AEDPA

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on the merits" in state court only if it concludes that the adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Su-

preme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

An "adjudication on the merits" is a "substantive, rather than a procedural, resolution of a federal claim." *Sellan v. Kuhlman,* 261 F.3d 303, 313 (2d Cir.2001) (quoting *Aycox v. Lytle,* 196 F.3d 1174, 1178 (10th Cir.1999)). Under the "contrary to" clause, "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Williams v. Taylor,* 529 U.S. 362, 412–13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (O'Connor, J., concurring and writing for the majority in this part). Under the "unreasonable application" clause, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413, 120 S.Ct. 1495. "[F]ederal law, as determined by the Supreme Court, may as much be a generalized standard that must be followed, as a bright-line rule designed to effectuate such a standard in a particular context." *Overton v. Newton,* 295 F.3d 270, 278 (2d Cir.2002). Determination of factual issues made by a state court "shall be presumed to be correct," and the applicant "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

### III. Exhaustion

In the past, a state prisoner's federal habeas petition had to be dismissed if the prisoner did not exhaust available state remedies as to any of his federal claims. *See Rose v. Lundy,* 455 U.S. 509, 522, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). "This exhaustion requirement is . . . grounded in principles of comity; in a federal system, the States should have the first opportunity to address and correct alleged violations of [a] state prisoner's federal rights." *Coleman v. Thompson,* 501 U.S. 722, 731, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). The exhaustion requirement requires the petitioner to have presented to the state court "both the factual and legal premises of the claim he asserts in federal court." *Daye v. Attorney General,* 696 F.2d 186, 191 (2d Cir.1982) (en banc).

 Pursuant to AEDPA, a district court may now, in its discretion, *deny* on the merits habeas petitions containing unexhausted claims—so-called "mixed petitions." *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the state."). In addition, the state may waive the exhaustion requirement, but a "State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement." *Id.* § 2254(b)(3); *see also Ramos v. Keane,* No. 98 CIV. 1604, 2000 WL 12142, at *2, 2000 U.S. Dist. LEXIS 101, at *10 (S.D.N.Y.2000) (state's failure to raise exhaustion requirement does not waive the issue).

### IV. Procedural Bar

 A federal habeas court may not review a state prisoner's federal claims if those claims were defaulted in state court pursuant to an independent and adequate state procedural rule, "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will

result in a fundamental miscarriage of justice." *Coleman,* 501 U.S. at 750, 111 S.Ct. 2546.

■ If a state court holding contains a plain statement that a claim is procedurally barred then the federal habeas court may not review it, even if the state court also rejected the claim on the merits in the alternative. *See Harris v. Reed,* 489 U.S. 255, 264 n. 10, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) ("a state court need not fear reaching the merits of a federal claim in an *alternative* holding" so long as it explicitly invokes a state procedural rule as a separate basis for its decision).

■ When a state court "uses language such as 'the defendant's remaining contentions are either unpreserved for appellate review or without merit,' the validity of the claim is preserved and is subject to federal review." *Fama v. Comm'r of Corr. Svcs.,* 235 F.3d 804, 810 (2d Cir. 2000). When a state court "says that a claim is 'not preserved for appellate review' and then ruled 'in any event' on the merits, such a claim is not preserved." *Glenn v. Bartlett,* 98 F.3d 721, 724–25 (2d Cir.1996).

## V. Certificate of Appealability

This opinion complies with *Miranda v. Bennett,* 322 F.3d 171, 175–77 (2d Cir. 2003), and Rule 52 of the Federal Rules of Civil Procedure. No other issue open to consideration by this court has merit. *See Sumner v. Mata,* 449 U.S. 539, 548, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981) ("a court need not elaborate or give reasons for rejecting claims which it regards as frivolous or totally without merit").

A certificate of appealability may be granted with respect to any one of petitioner's claims only if petitioner can make a substantial showing of the denial of a constitutional right. Petitioner has a right to seek a certificate of appealability from the Court of Appeals for the Second Circuit. *See* 28 U.S.C. § 2253; *Miller–El v. Cockrell,* 537 U.S. 322, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003).

## VI. Analysis of Claims

Petitioner claims that his Fifth and Fourteenth Amendment rights were violated by the trial court's failure to suppress statements obtained by police in violation of *Miranda.* The claim is exhausted and was not procedurally defaulted in the state courts. Review in this federal court is thus appropriate under the deferential standards of AEDPA.

A person questioned by law enforcement officers after being "taken into custody or otherwise deprived of his freedom of action in any significant way" must be "warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602; *see also Dickerson v. United States,* 530 U.S. 428, 444, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000) (refusing to overrule *Miranda* ). "Custodial interrogation" is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.; see also Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (per curiam) (duty to give *Miranda* warnings is triggered "only where there has been such a restriction on a person's freedom as to render him 'in custody' ").

■ "Two discrete inquiries are essential to the determination" of whether a defendant has been taken into custody for *Miranda* purposes: "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to termi-

nate the interrogation and leave." *Thompson v. Keohane,* 516 U.S. 99, 113, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995) (footnote omitted).

Petitioner's argument hinges on the propriety of the trial court's determination that he was not in custody at the time he made his statements to the investigating officer. He emphasizes the factual circumstance that he was initially held at gunpoint by police, that he was frisked, that he was escorted to the hospital with a uniformed officer in the ambulance, and that two uniformed officers stood outside his hospital room door while he was being questioned. These factual matters are not contested by either party. Both the hearing court and the Appellate Division concluded that under the unique circumstances of the instant case petitioner was not in custody and that no reasonable person would believe himself to be in custody.

The hearing court, in its written decision, noted that *Miranda* warnings need only be administered after a person has been taken into custody or otherwise deprived of his freedom, and that it was "clear to this Court that at the time that the defendant initially spoke to Detective Hunt while laying on a guerney in the Trauma Room, he was considered only a participant in the incident ... and the police were unclear and uncertain as to what exact role he played in that incident." July 24, 1997 Decision at 5–6. The hearing court continued,

> Detective Hunt, having been previously briefed by Police Officer Gennaro, knew that one of the males, Sergi Zadorozhnyi, had been pointing a gun at the other male, who was now before him laying on the gurney in the hospital. Detective Hunt was unclear as to each participant's involvement, to wit: who had done what to whom, and the detective's questions to Gren were asked to clarify this confusing situation.

While Detective Hunt spoke to Bogden Gren, he was not cuffed, the atmosphere was non-custodial and a person, innocent of any crime, would not have considered himself in custody. Further, where the purpose of the conversation is to clarify a situation, as evidenced by the circumstances of this case, *Miranda* warnings are unnecessary prior to the conversation (*People v. Lediard,* 115 A.D.2d 564[, 496 N.Y.S.2d 85 (1985)]). The nature of Detective Hunt's questions were of an investigatory nature, rather than accusatory (*People v. Arcese,* 148 A.D.2d 460[, 538 N.Y.S.2d 614 (1989)]; *People v. Krystof,* 84 A.D.2d 566[, 443 N.Y.S.2d 258 (1981)]) and asked in an effort to clarify the confusion inherent in the circumstances surrounding the Queens Boulevard melee.

Additional indicia of the detective's initial uncertainty as to the roles played by each participant was subsequently reinforced by Detective Hunt's conduct when he returned to the hospital for a second interview with Gren. Gren's alleged involvement in the incident had been ascertained, and thus, prior to a second conversation with him, Detective Hunt properly administered each and every *Miranda* warning. At that point, police personnel were aware of the details concerning the incident at Queens Boulevard. They had probable cause to believe that Bogdan Gren was criminally involved and although not yet arraigned, he was clearly a suspect in police custody. Detective Hunt knew that any further conversation with Gren could only be undertaken after Gren's affirmative waiver of his *Miranda* warnings. Inasmuch as Gren refused to speak to Detective Hunt without counsel present, all further questioning stopped.

Accordingly, the People have satisfied their burden of going forward in the first instance to demonstrate that the

defendant Gren's statement as he lay on the gurney in the Trauma Room, was non-custodial in nature and elicited to clarify the situation at hand. Accordingly, the defendant Bogdan Gren's motion to suppress his statement is denied and such statement is admissible at trial. *Id.* at 6–7.

The Appellate Division affirmed this decision:

> The defendant was involved in the kidnapping and shooting death of the victim. At the suppression hearing, testimony was elicited that the defendant was stopped by a police officer who was under the impression he was responding to an automobile accident. The officer's purpose in responding to the scene was "to take an accident report." He drew his gun when he saw that the defendant's companion was armed. The police soon ascertained that the defendant was seriously injured, and transported him to the hospital by ambulance. The officer who accompanied the defendant to the hospital in the ambulance patted him down for her safety, but was unaware of whether the defendant was considered a suspect or a victim. The defendant was not handcuffed at any time.

> No police officers other than Detective Hunt were in the trauma room with the defendant when Detective Hunt questioned him. As the hearing court found, Detective Hunt did not know "who had done what to whom." Before he questioned the defendant, Detective Hunt asked the attending physician for permission, because he was concerned about the defendant's physical condition, and whether he was likely to die. Detective Hunt's questioning was investigatory, not accusatory. During the questioning, the defendant admitted to Detective Hunt that he had kidnapped the victim.

> In view of the foregoing, the hearing court properly found that, under the circumstances, a reasonable person innocent of any crime would not have believed he was in custody, and the defendant was not entitled to the suppression of that statement based on the absence of *Miranda* warnings.

*People v. Gren,* 285 A.D.2d 612, 729 N.Y.S.2d 489, 490–91 (App.Div.2001) (citations omitted).

Petitioner urges that both the hearing court and the Appellate Division applied an erroneous test to determine whether there had been a *Miranda* violation, improperly focusing on whether the questioning in this case was "investigatory or accusatory" and whether the questioning was done merely to "clarify the situation," rather than focusing on whether petitioner reasonably felt that he was at liberty to terminate the interrogation and leave.

■ "It is well settled . . . that a police officer's subjective view that the individual under questioning is a suspect, if undisclosed, does not bear upon the question whether the individual is in custody for purposes of *Miranda,* . . . [and] the same principle obtains if an officer's undisclosed assessment is that the person being questioned is not a suspect," because "[i]n either instance, one cannot expect the person under interrogation to probe the officer's innermost thoughts." *Stansbury v. California,* 511 U.S. 318, 324, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (per curiam). An officer's subjective beliefs are relevant only to the extent they would affect "how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action." *Id.* at 324–35, 114 S.Ct. 1526; *see also Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) ("A policeman's unarticulated plan has no bear-

ing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation.").

■ The focus of the *Miranda* inquiry in the instant case should thus have been on the objective question of whether an individual in petitioner's circumstances would have felt at liberty to terminate the interrogation and leave. Contrary to petitioner's contention, that inquiry was made by the state courts and was decided against petitioner. As the Appellate Division stated, under the instant circumstances "a reasonable person innocent of any crime would not have believed he was in custody." That conclusion is reasonable. Any further observations noted by the hearing court and the Appellate Division merely supplemented this conclusion and served to fill out the context in which the questioning occurred. Taken out of context, it might seem reasonable to presume that an individual held at gunpoint, frisked and then supplied with guards outside of his hospital room was in fact "in custody."

But context is decisive here. Guns were drawn and a frisk was conducted in order to assure the safety of the police in an uncertain and dangerous situation. Petitioner was not handcuffed after he was frisked and he was not placed under arrest. Instead he was taken to a hospital, accompanied by an officer who was as likely to view petitioner as a victim or a witness as he was to view petitioner as a suspect. At the hospital petitioner was not handcuffed to his bed. Guards were not stationed in such a way that he was aware of their presence. Whatever the subjective opinions of the police might have been with respect to petitioner's status as a suspect in a homicide, it was reasonable for the state courts to conclude that a reasonable person in petitioner's

circumstances would not have felt himself to be in police custody. Whether another judge would have reached the same conclusion if the suppression hearing had been conducted in front of him or her is irrelevant. The Appellate Division properly applied *Miranda* in a reasonable manner. Habeas relief is not warranted on this claim. There is no other claim that might now be made that would not be frivolous.

## VII. Conclusion

The petition for a writ of habeas corpus is denied.

A certificate of appealability is granted with respect to petitioner's claim that his Fifth and Fourteenth Amendment rights were violated by the trial court's failure to suppress statements obtained by police in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

SO ORDERED.