[Cite as *State v. Myer*, 2017-Ohio-1047.]

COURT OF APPEALS
PERRY COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  |  |
|---|---|---|
| STATE OF OHIO | : | **JUDGES:**<br>Hon. W. Scott Gwin, J. |
|  | : | Hon. William B. Hoffman, J. |
| Plaintiff-Appellant | : | Hon. Craig R. Baldwin, J. |
|  | : |  |
| -vs- | : |  |
|  | : | Case No. 16-CA-00008 |
| JAMIE L. MYER | : |  |
|  | : |  |
| Defendant-Appellee | : | O P I N I O N |

CHARACTER OF PROCEEDING:      Criminal appeal from the Perry County
Court of Common Pleas, Case No.16-CR-
0007

JUDGMENT:      Affirmed

DATE OF JUDGMENT ENTRY:      March 22, 2017

APPEARANCES:

For Plaintiff-Appellant      For Defendant-Appellee

JOSEPH FLAUTT      MICHAEL DALSANTO
111 North High Street      33 W. Main Street
Box 569      Suite 106
New Lexington, OH 43764      Newark, OH 43055

*Gwin, P.J.*

**{¶1}** Plaintiff-appellant the State of Ohio appeals the August 19, 2016 Judgment Entry of the Perry County Court of Common Pleas granting defendant-appellee Jamie Myer's ["Myer"] motion to suppress.

*Facts and Procedural History*

**{¶2}** The facts leading to Myer's initial arrest and incarceration on November 14, 2015 are set forth in the companion appeal *State v. Myer,* 5th Dist. Perry No. 16-CA-0007. The state's first assignment of error was addressed in that case.

**{¶3}** Myer was subsequently indicted in Perry County Court of Common Pleas, Case No. 16-CR-0007 on February 19, 2016. That case is the subject of this appeal. The state's second assignment of error will be addressed in this appeal.

**Perry County Court of Common Pleas, Case No. 16-CR-0007.**

**{¶4}** On December 8, 2015, Myer was detained in booking at the Perry County Sheriff's Office. Myer asked if she could speak with Sergeant Briggs, the officer that had arrested her on November 14, 2016. Sergeant Briggs moved Myer from the first floor of the Sheriff's Office to the third floor interview room. The pair engaged in an unrecorded conversation for several minutes about Myer becoming an informant. Myer was at all times in the custody of the Sheriff in Perry County Court of Common Pleas, Case No. 15-CR-0005. Sergeant Briggs did not read Myer her *Miranda* warnings at that time. He also did not tell Myer that she was free to leave.

**{¶5}** After approximately fifteen minutes, Sergeant Briggs left the interview room to speak with Lieutenant Starrett. Lieutenant Starrett activated recording equipment in the interview room at that time. (T. at. at 65). The recording of this interview was

admitted at the suppression hearing as Joint Exhibit 1. (T. at 2). No transcript was prepared of the audio-recorded portion of the interview.

{¶6} The recorded portion of the interview began with Sergeant Briggs describing a heroin overdose by T. D. Sergeant Briggs informs Myer that the overdose is "the one that he can prove that you [Myer] were involved." (*See,* Joint Exhibit 1, File 20151208_153716_PCSO_RM 140001 at 01:00, *et seq*). Sergeant Briggs then tells Myer that he could trace another overdose back to her, the fatal overdose of A. M. Sergeant Briggs told Myer that the heroin was a "bad batch" and that the "bad batch" had caused A.M.'s overdose. (Id. at 01:50). They then discussed Myer's tolerance for heroin, and the makeup of heroin verses Percocet. (Id. at 2:30, *et seq*). Early in the interview, Briggs asked Myer if she "gave [T.D.] the heroin." Myer confessed to selling T. D. heroin. (Id. at 3:40).

{¶7} The conversation turned to whether Myer or her boyfriend D. S. gave A.M. a fatal dose of heroin on the night that she died,

[BRIGGS]: Let's just be honest here. Let's — let's get this out in the open. I mean — if — if — if you had something to do with this or you know [D.S.] had something to do with this, that's going to haunt you for the rest of your life. You know that, right? You're never going to forget that, that's going to eat at you and eat at you and eat at you. So let's just be honest. If you know that [D.S.] gave her heroin, be honest. If you did it, be honest. And that's the only thing that you can do. And if not, you're gonna live with that.

[MYER]: And then what?

[BRIGGS]: That I don't know. But -

[MYER]:      I mean, I know I didn't give her anything.  Because I told her,

I kept telling her not to — not to do anything.

[BRIGGS]:    So, where'd she get heroin then?

[MYER]:      I mean, she was with me and [D.S.] both, so —

[BRIGGS];    She was with you and [D.S.] both?

[MYER]:      Yeah.

[BRIGGS]:    Did you give her any heroin?

[MYER]:      No.

[BRIGGS]:    Did [D.S.] give her any heroin?

[MYER]:      Not that I know of.

[BRIGGS]:    Now why you gonna sit here and lie to me?

[MYER]:      [Laughs]

[BRIGGS]:    Have I ever lied to you?

[MYER]:      No.

[BRIGGS]:    Have I always been straight up and honest with you?

[MYER]:      I've always been straight up and honest with you too.

[BRIGGS]:    You lied to me during the traffic stop.

[MYER]:      How?

[BRIGGS]:    You denied having anything in the car.

[MYER]:      No I didn't, I said it was in my purse.

[BRIGGS]:    No, when I first asked you, you said there was nothing.

[MYER]:      Oh, well, I don't even remember that.

[BRIGGS]: Have I always been straight up and honest with you? Have I ever sugarcoated anything? Have I ever answered a question that I couldn't answer or do I tell you I'm gonna look into it? I'm not gonna lie to you, I'm not gonna bullshit ya. That's not my style. I'm very straight up and very straightforward.

[MYER]: What are we facing with this? I mean —

[BRIGGS]: *Well, depends on what exactly what your part was. I mean, there's charges that are misdemeanors and there's charges that could be felonies, I don't know. I'd have to know the exact details of what happened and what took place.* And then from there, I could let you know. But I mean the investigation is going to ensue. It's going to happen. I mean, we're gonna go hook [D.S.] up and talk to him, and we're gonna go talk to every — we've already got statements from everybody surrounding [A.M.]. I mean it's just - it's just a matter of time. I mean, I'm not — I'm not here for my benefit. I'm here to show that you're going to cooperate. It's no skin off my back, you know what I mean? I get paid the same amount whether you cooperate —

[MYER]: Right.

[BRIGGS]: — or whether you lie to me. I'm not gonna get upset at you, tip the table over. [Inaudible]. You know? But I'm here to give you your amnesty hour. I'm here to give you that opportunity to be honest, to get that off your chest and to help yourself out.

[MYER]: How are you going to help me?

[BRIGGS]:    Well, cooperation always goes a long way.

[MYER]:    I mean, I don't remember who — if anyone gave her anything.

[BRIGGS]:    You do, because it's weighing on your chest heavy right now. I can see it in your eyes.  You want to tell me but you're afraid to tell me. I've been doing this a long time, Jamie.  I've interviewed a thousand people from that chair.  Honesty is your only saving grace here.  I'm not here to pass judgment, that's not my job, that's — that's for powers above me.  But I'm here to tell you, there's a reason why Catholics hold confession, to get things off their chest.  You know what I mean, I mean — I'm not — I'm not gonna pry it out of ya, but I'm gonna give you an opportunity.  It's like during the traffic stop, I gave you an opportunity to be honest with me.

[MYER]:    I told you everything.  I mean, I gave you everything.

[BRIGGS]:    Right, and I'm giving you that opportunity right now.

[MYER]:    What is that gonna do for me?

[BRIGGS]:    *Without knowing the role that you played in that, I can't answer that question.  You tell me the role that you played, and I can have a little more insight and let you know what charges would fit the bill.*  Right now, I can only speculate, I mean, there's — there's — misdemeanor charges of like reckless homicide and stuff like that and then there's involuntary manslaughter which are felonies — which — depending on the circumstances and, I mean, there's so many variables and laws, different subsections, you know what I mean?

**{¶8}**   Joint Exhibit 1, File 20151208_153716_PCSO_RM 1_00001 at 5:00 to 10:00 (emphasis added).

**{¶9}**   Sergeant Briggs next describes the drug possession statutes to emphasize the point that he cannot know with what Myer will be charged.  (Id. at 10:00 — 11:30). Shortly thereafter, Myer admitted to giving A.M. heroin the night before she died but denied selling it to her.  (Id. at 12:30).

**{¶10}**  The interrogation continued as follows at approximately 13:20,

[BRIGGS]...You guys had heroin on you as you were users and sellers both?

[MYER]:       I don't — yeah.

[BRIGGS]:    Basically, you sell heroin to support your heroin habit.  [D.S.] sells heroin to support his heroin habit.  Is that correct?

[MYER:]      Yeah, I never sold to anybody until I was with [D.S.].  Like, it was all his people.

[BRIGGS]:  Right, right, right.  And I get that.  So you guys were with [A.M.] the night before, and I'm assuming that you guys had heroin on you.

[MYER]:       (Affirmative response).

[BRIGGS]:    *Okay, did you give the heroin to Jamie, or did you use heroin with Jamie?*

[MYER]:       [A.M.]

[BRIGGS]:    Er - I'm sorry, [inaudible] [A.M.].  Did you give heroin to [A.M.], or did you use heroin with [A.M.]?

[MYER]:       I used heroin with [A.M.] the night that — the night before.

[BRIGGS]:      Did [D.S.] use with her too?

[MYER]:        I don't remember.  We went to Walmart in Pickerington.

[BRIGGS]:      You and...?

[MYER]:        [A.M.].

[BRIGGS]:      Anybody else go with you?

[MYER]:        (Negative response).

[BRIGGS]:      Did you go before or after you used the heroin?  With her?

[MYER]:        We went after.

[BRIGGS]:      The one in Pickerington?

[MYER]:        I don't know.  I don't remember.  That's just where we always went.

[BRIGGS]:      What time do you think you used with her?

[MYER]:        That was — uh — I don't know.  It was at night.  It was like maybe nine — it was after dark.

[BRIGGS]:      Are we talking like....

[MYER]:        Nine, ten o'clock probably.  I mean she was fine when I dropped her off.  Because if anyone, anyone would have been with me and OD'd I would call, I would call 9-1-1.

[BRIGGS]:      Oh, absolutely.

[MYER]:        I wouldn't fuckin' let somebody die.

[BRIGGS]:      *All right.  Back to [T.D.] How many times did you sell to [T.D.] total? Because he said he was [inaudible].*

[MYER]:        [D.S.] usually met him.

[BRIGGS]:    Okay.  How many times?

[MYER]:     I don't know, quite a few.

[BRIGGS]:    How many times did you meet him?

[MYER]:     A few.

[BRIGGS]:    When you would meet him, where would you meet him at?

[MYER]:     Usually right down the road from [D.S.'s].

[BRIGGS]:    [Inaudible].  Like at the [inaudible] tanks?

[MYER]:     Mhmm.Yeah, there or by [inaudible] Road.

[BRIGGS]:    *Uh - how much did you usually sell him at a time?*

[MYER]:     Like a bag to three bags.

[BRIGGS]:    So, a tenth to three tenths of a gram?

[MYER]:     Well, if that.  Like -

[BRIGGS]:    You're pinchin' it, but —

[MYER]:     I mean, if [D.S.] made them, they were small.  (Laughter).  I'm just sayin'.  'Cuz he's really stingy with shit, even with me.  And how the hell would I even get him for trafficking.  I mean, like, I would have to go get shit off of my guy in Columbus, and bring it down here.  You know what I mean?

[BRIGGS]:    So?

[MYER]:     Well, I'm saying that if you want me to do that that's how it would have to happen.

[BRIGGS]:    *Okay.  Uh — when is the last — the last time you met with [T.D.], how much did he buy?*

[MYER]:     A bag.  Twenty bucks.

[BRIGGS]:     Twenty bucks a tenth?

[MYER]:        Well yeah.

[BRIGGS]:     That's fuckin' ridiculous!

[MYER]:        What do you mean?

[BRIGGS]:     It's ten dollars a tenth!

[MYER]:        Maybe in Columbus, or California.  California I could get, I could pay ten dollars and I'd get heroin and coke together.

[BRIGGS]:     Nice.  Where did you meet him at when he bought that time, do you remember, the last time?

[MYER]:        Out on 668.  Err — whatever.  It goes to — um— Logan.

[BRIGGS]:     Okay.

[MYER]:        Is that where he lives?

[BRIGGS]:     Just a second, he's calling' for me.

{¶11}  Joint Exhibit 1, File 20151208_153716_PCSO_RM 1_00001, at 13:20 to 18:06 (emphasis added).

{¶12}  At that point, Sergeant Briggs left for approximately thirteen minutes and returned.  Id at 18:06 to 31:33.

[BRIGGS]:     My fancy notebook.  All right, sorry about that.  I forget where we were at....  Oh, okay.  Here's the thing.  What?  You got something to say?  You started talking.

[MYER]:        So, if I were to get [D.S.] for trafficking, what would that...?

[BRIGGS]:     Uhhh, we'll talk about that in a second.  Basically, everything I'm talking to you about, um, I actually — I just went and pulled [A.M.'s]

report from the night.  It's all — I mean — family says that she left to go to Walmart with you at around 11:00 and she was fine.  I think that's all Kosher to be honest with you.  I mean, I have to look at the autopsy report and all that stuff before I could make a determination, but —

[MYER]:        Right.

[BRIGGS]:    Everything you told me was accurate.

[MYER]:        Yeah, I know.

[BRIGGS]:    According to the report.  So, um, here's the thing.  I'm getting into an investigation of other things.  And, let's just be honest, we know [Lieutenant] Starrett's a dick.  I'll admit it.  So, what I'm gonna do is, I'm just gonna, remember when I traffic stopped you I read you *Miranda*?

[MYER]:        Yeah.

[BRIGGS]:     I'm just gonna do that again.  Then we're gonna talk about this and, I just, I don't, I mean everything you said about [A.M.] was fine.  I mean, it all matched up, so, I mean, in the report it states that there were two empty bottles of Klonopin in the dresser drawer, right by she was at and stuff.  So, what I'm gonna do is gonna go over and talk to — uh — Dr. Wilson.  Or I'm gonna have him pull it up [inaudible].  But, uh, I mean, if that all checks out, I don't see any...

[MYER]:        Yeah, I swear to you, that's everything.

[BRIGGS]:    *But what we're going to do is I'm going to read you Miranda, just like I did the night of the traffic stop.*

[MYER]:        *Why?*

[BRIGGS]:      *Why what?*

[MYER]:        *Why are you reading me my rights again?*

[BRIGGS]:      *Because basically Starrett's bitchin' at me for talking without reading Miranda.*

[MYER]:        Oh.

[BRIGGS]:      I'm not gonna ask you anything different.  I'm not gonna — I'm still not gonna flip this table because it's heavy.  I'm not gonna try to pressure you into anything.  [Inaudible]  I'm going to ask you the same questions I've already asked you, you can tell me to go pound sand, I really don't care.  *But, it's just, I'm getting getting bitched at because I didn't read Miranda.*  So, that's what it boils down to, I'm not going to lie.  So, let's go over here so you can read this with me.  Same one I read you last time only a different header than the one downstairs.  These are what we have up here.  We don't have the Perry County ones up here.  All right, before I ask you any questions, you must first understand your rights.  You have the right to remain silent.  Anything you say can and be [sic] used against you in a court of law.  You have a right to a lawyer and have one present with you while being questioned.  If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish. If you decide to answer questions now without a lawyer present, you still have the right to stop answering questions at any time.  You also have the right to stop answering questions at any time until you talk to a lawyer.  Do you understand that?  That being said, I'm not going to ask you any questions

about your traffic stop, okay? I'm not going to ask you to incriminate yourself about the traffic stop I made and what was found. *I am going to ask you about [T.D.] and [A.M.] and that's it, that's all I'm gonna ask you about. Because I don't want you incriminating yourself about the traffic stop.*

[MYER]:       Okay (laughing).

[BRIGGS]:     That's me trying to be polite and courteous. I'm not gonna try and hem you up on that. That traffic stop in my mind is done. I have nothing more to say about that. Okay? Do you understand everything? I just need you to, same as before, initial, read that, sign.

[MYER]:       I'm trying to get a hold of my mom and dad before I leave here.

[BRIGGS]:     Yeah, I'll let you make a phone call, I don't have a problem with that.

[BRIGGS]:     Read that out loud to me.

[MYER]:       I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

[BRIGGS]:     Okay. Just sign and date it there.

[MYER]:       *But what if I want a lawyer present?*

[BRIGGS]:     Pardon me? Then I'll get up and walk out. I have no problem doing that.

[MYER]:       What's today's date?

[BRIGGS]:     Twelve ... seven.., eight.  Today is the eighth.  I had to think.  Umm.  If you don't want to talk, if you want a lawyer, by all means tell me and well conclude the interview.  Umm, like I said, I'm not gonna talk to you about anything regarding your traffic stop or anything like that, *same questions I already asked you.*

[MYER]:       *But you already know my answers.  I mean,*

[BRIGGS]:     *Right.  I need to take better notes.*

[MYER]:       (Laughter)

[BRIGGS]:     Look, I'm not a perfect cop, all right?  I'm not.  I make plenty of mistakes. *The other thing I want you to do is I want you to talk to Kevin today.*

[MYER]:       *You want me to talk to Kevin?*

[BRIGGS]:     *I want you to talk to Kevin.  And I want you to talk to Kevin about everything.  [T.D.] and [A.M.], [D.S.].  I need you to help you.*

**{¶13}**  Joint Exhibit 1, File 20151208_153716_PCSO_RM 1_00001 at 31:33 to 38:00 (emphasis added).

**{¶14}**  After this, Myer continued to engage in an interview with Sergeant Briggs, and later Lieutenant Starrett and Sergeant Briggs, covering the same topics with respect to selling heroin, and also other drug transactions that she had engaged in during that time.

**{¶15}**  Myer filed a motion to suppress on June 14, 2016.  The trial court held an evidentiary hearing on July 7, 2016.  By Judgment Entry filed August 19, 2016, the trial court granted Myer's motion to suppress.

{¶16} On August 23, 2016, the state filed a certifying statement as outlined in Crim.R. 12(K). Accordingly, this Court has jurisdiction to entertain the state's appeal from the trial court's decision to suppress evidence.

*Assignment of Error*

{¶17} As relevant to this case, the state has raised one assignment of error[1],

{¶18} "II. THE TRIAL COURT IMPROPERLY SUPPRESSED THE ENTIRE STATEMENT OF APPELLEE MADE ON DECEMBER 8, 2015."

*Law and Analysis*

{¶19} Appellate review of a motion to suppress presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 154-155, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. When ruling on a motion to suppress, the trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and to evaluate witness credibility. See *State v. Dunlap*, 73 Ohio St.3d 308,314, 1995-Ohio-243, 652 N.E.2d 988; *State v. Fanning*, 1 Ohio St.3d 19, 20, 437 N.E.2d 583 (1982). Accordingly, a reviewing court must defer to the trial court's factual findings if competent, credible evidence exists to support those findings. See *Burnside,* supra; *Dunlap,* supra; *State v. Long*, 127 Ohio App.3d 328, 332, 713 N.E.2d 1(4th Dist. 1998); *State v. Medcalf*, 111 Ohio App.3d 142, 675 N.E.2d 1268 (4th Dist. 1996). However, once this Court has accepted those facts as true, it must independently determine as a matter of law whether the trial court met the applicable legal standard. See *Burnside,* supra, citing *State v. McNamara*, 124 Ohio App.3d 706, 707 N.E.2d 539(4th Dist. 1997); See, generally, *United States v. Arvizu*, 534

---

[1] Myer was previously indicted in Perry County Court of Common Pleas, Case No. 16-CR-0005 on January 21, 2016. That case is the subject of the appeal in *State v. Myer*, 5th Dist. Perry No. 16-CA-0007. The state's first assignment of error will be addressed in that appeal.

U.S. 266, 122 S.Ct. 744, 151 L.Ed.2d 740(2002); *Ornelas v. United States*, 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911(1996).  That is, the application of the law to the trial court's findings of fact is subject to a *de novo* standard of review *Ornelas*, supra. Moreover, due weight should be given "to inferences drawn from those facts by resident judges and local law enforcement officers."  *Ornelas*, supra at 698, 116 S.Ct. at 1663.

### *Miranda.*

{¶20}  The Fifth Amendment to the United States Constitution guarantees that "'[n]o person * * * shall be compelled in any criminal case to be a witness against himself,' and that 'the accused shall * * * have the Assistance of Counsel.'" (*Ellipses sic.*)  *Miranda v. Arizona,* 384 U.S. 436, 442, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Accord, State v. Barker,* ___ Ohio St.3d ___, 2016-Ohio-2708, ___N.E.2d ___ (Apr. 28, 2016), ¶21.  The inherently coercive nature of custodial interrogation heightens the risk that a suspect will be denied the Fifth Amendment privilege not to be compelled to incriminate himself because custodial interrogation can " 'undermine the individual's will to resist and * * * compel him to speak where he would not otherwise do so freely.'" (*Ellipsis sic.*)  *J.D.B. v. North Carolina*, 564 U.S. 261, 131 S.Ct. 2394, 2401, 180 L.Ed.2d 310 (2011), *quoting Miranda* at 467, 86 S.Ct. 1602; *Dickerson v. United States*, 530 U.S. 428, 435, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000).

{¶21}  In light of the inherent coercion involved in custodial interrogation, *Miranda* established "a set of prophylactic measures" to safeguard the constitutional privilege against self-incrimination.  Id.  In broad terms, *Miranda* held that the state may not use a defendant's statements from custodial interrogation "unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."

*Miranda* at 444, 86 S.Ct. 1602.  Prior to questioning, the police must warn the suspect "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."  Id.  The Supreme Court recognized the importance of a suspect's "real understanding" of his rights and his intelligent decision whether to exercise them.  Id. at 469, 86 S.Ct. 1602; *State v. Barker,* ___ Ohio St.3d ___, 2016-Ohio-2708, ___N.E.2d ___, ¶22.

**{¶22}** *Miranda* conditioned the admissibility at trial of any custodial confession on warning a suspect of his rights: failure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained.  *Missouri v. Seibert*, 542 U.S. 600, 608, 124 S.Ct. 2601, 159 L.Ed.2d 643(2004).

**{¶23}** In the case at bar, Myer voluntarily contacted Sargent Briggs and requested and opportunity to speak to him about becoming a confidential informant.  The pair spoke for a period of time before the recording device was activated.  Myer was not advised of her rights under *Miranda* prior to the unrecorded discussions.  Nor did Sargent Briggs advise Myer of her rights at the time the recording equipment was activated.

**{¶24}** The state argues that Myer's statements to Sergeant Briggs were voluntarily and further the statements were not made while she was being interrogated.  The state agrees that Myer was in custody.[2]

***Interrogation requiring Miranda Warnings.***

**{¶25}** "A suspect in police custody 'must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court

---

[2] The state did not contest the issue of "custody" in the trial court or in its brief in this Court.

of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.'" *State v. Lather,* 110 Ohio St.3d 270, 2006–Ohio–4477, ¶ 6, *quoting Miranda v. Arizona*, 384 U.S. 436, 479 (1966).

{¶26} In *Rhode Island v. Innis*, the United States Supreme Court defined "interrogation,"

> We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of

police officers that they should have known were reasonably likely to elicit

an incriminating response.

446 U.S. 291, 300-302, 100 S.Ct. 1682, 64 L.Ed.2d 297(1980 (footnotes omitted).  The

Court further noted, "[a]ny knowledge the police may have had concerning the unusual

susceptibility of a defendant to a particular form of persuasion might be an important factor

in determining whether the police should have known that their words or actions were

reasonably likely to elicit an incriminating response from the suspect."  446 U.S. 302, 100

S.Ct. 1682, 64 L.Ed.2d 297, n.8.

{¶27}  In the case at bar, Myer sought to speak to the police in an attempt to garner

favorable treatment in her then pending drug case. Her request to speak to Sergeant

Briggs was not for the purpose of talking about that case or any other crime with which

she may have been involved.  We further note that in this situation law enforcement hold

the keys to its own destiny; if the suspect is advised of his or her *Miranda* rights prior to

any discussions and a waiver is obtained, then admissibility of any incriminating

statements becomes a less Herculean task for the state.

{¶28}  In the case at bar, Sergeant Briggs did not stop the questioning at the point

Myer began to incriminated herself; rather he began the interrogation accusing Myer of

involvement in the overdose deaths of A.M. and T.D. He continued to guide and

encourage her with pointed and leading questions directed to further implicating herself

in other crimes. When asked by Myer "what is that gonna do for me?" Briggs responded

"Without knowing what role you played in that, I can't answer that question.  You tell me

the role that you played, and I can have a little more insight and let you know what charges

would fit the bill." Clearly this is contrary to the state's assertion that "he still did not give

*Miranda* warnings because he [Briggs] was not interrogating [Myer] about her involvement in crime." (Appellant's Brief at 9).

**{¶29}** Sergeant Briggs was acutely aware that Myer was seeking to cooperate to garner favorable treatment in her pending drug case and he used that susceptibility to his advantage.

### *Question First Warn Later.*

**{¶30}** In *Missouri v. Seibert*, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643(2004), the United States Supreme Court addressed the issue of whether the technique of successive interrogations, the first before *Miranda* warnings and the other(s) after, violated a defendant's *Miranda* rights. In *Seibert*, the defendant was taken to the police station for questioning after a fire at her home resulted in the death of one of the residents. She was questioned about the incident without first being provided her *Miranda* warnings and she made incriminating statements. The defendant was then issued her *Miranda* warnings and was confronted with the statements she had made before she was provided such warnings. The defendant then confirmed her previous statements.

**{¶31}** In *Missouri v. Seibert*, the United States Supreme Court was troubled by the adherence to litigating the question of voluntariness where *Miranda* warnings were not given until after law enforcement had obtained a confession,

> There are those, of course, who preferred the old way of doing things, giving no warnings and litigating the voluntariness of any statement in nearly every instance. In the aftermath of *Miranda*, Congress even passed a statute seeking to restore that old regime, 18 U.S.C. § 3501, although the Act lay dormant for years until finally invoked and challenged

in *Dickerson v. United States, supra.* *Dickerson* reaffirmed *Miranda* and

held that its constitutional character prevailed against the statute.

542 U.S. 600, 609, 124 S.Ct. 2601, 159 L.Ed.2d 643(2004).

{¶32} The Court in *Seibert* court set forth the following test to determine the

effectiveness of the technique in any given case,

> The threshold issue when interrogators question first and warn later
> is thus whether it would be reasonable to find that in these circumstances
> the warnings could function "effectively" as *Miranda* requires.  Could the
> warnings effectively advise the suspect that he had a real choice about
> giving an admissible statement at that juncture?  Could they reasonably
> convey that he could choose to stop talking even if he had talked earlier?
> For unless the warnings could place a suspect who has just been
> interrogated in a position to make such an informed choice, there is no
> practical justification for accepting the formal warnings as compliance with
> *Miranda*, or for treating the second stage of interrogation as distinct from
> the first, unwarned and inadmissible segment.

> * * *

> Thus, when *Miranda* warnings are inserted in the midst of
> coordinated and continuing interrogation, they are likely to mislead and
> "depriv[e] a defendant of knowledge essential to his ability to understand
> the nature of his rights and the consequences of abandoning them." *Moran*
> *v. Burbine*, 475 U.S. 412, 424, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).  By
> the same token, it would ordinarily be unrealistic to treat two spates of

integrated and proximately conducted questioning as independent interrogations subject to independent evaluation simply because *Miranda* warnings formally punctuate them in the middle.

542 U.S. at 611-612; 613-614, 124 S.Ct. 2601, 159 L.Ed.2d 643.

**{¶33}** As noted by the Ohio Supreme Court in *State v. Farris*, 109 Ohio St.3d 519, 2006–Ohio–3255, 849 N.E.2d 985, "*Seibert* points out that in 'question first' scenarios when the circumstances of the given case show that the *Miranda* warning could not reasonably be found effective, the post warning statements are inadmissible because 'the earlier and later statements are realistically seen as parts of a single, unwarned sequence of questioning.' Id. at 612, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643, fn. 4." *Farris,* ¶ 21.

**{¶34}** The United States Supreme Court, in *Seibert,* specifically held that the following factors should be considered in determining whether *Miranda* warnings delivered midstream could be effective enough to accomplish their object: "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." Id. at 615; *Accord*, *State v. Bonnell,* 5th Dist. Delaware No. 07 CAA 01 0006, 2008-Ohio-28, ¶ 37.

**{¶35}** In the case at bar, before she was given her *Miranda* warnings Myer's was told that Sergeant Briggs had evidence that she was involved in the overdose deaths of T.D. and A.M. Myer asked Briggs, "what are we facing with this?" Briggs intimated that he would need more specific details about Myer's involvement before he could tell her.

Briggs specifically asked about the details of the night A.M. died, whether Myer, D.S., or both had given A.M. heroin. Briggs further directed Myer to details surrounding T.D.'s death.

{¶36} We find, based on the foregoing, that the trial court was correct in granting Myer's motion to suppress the statements she made before and after she was *Mirandized*. The statements were close in time to the statements Myer made prior to being given *Miranda* warnings, were elicited by the same deputy and overlapped in content with his earlier, pre-*Miranda* statements. The interrogations occurred in the police station while Myer was in custody on pending drug charges. As noted by Myer the second interrogation was treated as continuous with the initial interrogation is evidenced by the fact that the Sergeant Briggs told Myer "I'm not gonna ask you anything different…. I am going to ask you about T.D. and A.M. and that's it, that's all I'm gonna ask you about. Because I don't want you incriminating yourself about the traffic stop." Briggs continually asked her for more specific facts about her involvement in the deaths of A.M. and T.D. Indisputably, he had to have been aware that Myer's responses were reasonably likely to elicit an incriminating response from the suspect.

{¶37} We find that the "mid-stream" *Miranda* warnings in this case were not effective enough to accomplish their objectives and that the trial court, therefore, correctly granted Myer's Motion to Suppress her statements.

{¶38} The state's second assignment of error is overruled.

{¶39}  The judgment of the Perry County Court of Common Pleas is granted.


By Gwin, P.J.,

Hoffman, J., and

Baldwin, J., concur